**CITY OF NORWALK, Appellee,**

v.

**COCHRAN et al., Appellants.**

[Cite as *Norwalk v. Cochran* (1995), 108 Ohio App.3d 181.]

Court of Appeals of Ohio,
Sixth District, Huron County.

No. H–94–040.

Decided Dec. 29, 1995.

*Daniel Kasaris,* for appellee city of Norwalk.

*Jody L. Shumaker,* for appellant R. Thomas Cochran.

*Keith J. Watkins,* for appellant National Casualty Company.

GLASSER, Judge.

This case is an appeal from a judgment of the Huron County Court of Common Pleas. The trial court granted summary judgment in favor of appellee, the city of Norwalk, finding that appellant R. Thomas Cochran, as the former Mayor of the city and appellant Vernis O. George, as the former Finance Director for the city, did misappropriate public funds. The trial court also granted summary judgment in favor of Cochran and George's cross-claim for indemnification against third-party appellant National Casualty Company ("National Casualty"). For the reasons discussed below, we reverse the decision of the trial court.

In April 1991, the city of Norwalk commissioned the State Auditor ("Auditor") to perform an audit, pursuant to R.C. Chapter 117, of various expenditures of public funds. Subsequently, the Auditor issued findings for recovery against Mayor Cochran and Finance Director George on the ground that they had illegally expended and/or misappropriated public monies. On October 30, 1991, the city of Norwalk filed its complaint against Cochran and George in order to recover public monies identified in the audit as having been illegally expended and/or misappropriated. On October 30, 1992, Cochran filed a cross-claim

against National Casualty for indemnification and attorney fees under the public officials liability coverage of a policy issued to the city of Norwalk.

A pretrial conference was held on December 17, 1993. As a result of the conference the trial court ordered a discovery cut-off date of June 25, 1994, and also ordered that all motions were to be filed by July 23, 1994. The trial court also set a final pretrial for September 9, 1994, with trial scheduled for September 20, 1994.

On March 17, 1994, the city served its first set of interrogatories on Cochran and George. On April 25, 1994, Cochran's attorney wrote the city that he had been unsuccessful in contacting Cochran since receipt of the interrogatories, but that he was still attempting to contact him. On April 28, 1994, the city filed a motion to compel discovery against Cochran. Meanwhile, Cochran's attorney had contacted Cochran, who completed interrogatories. On July 27, 1994, Cochran served his answers to the interrogatories on the city. The city subsequently filed a motion to dismiss its motion for sanctions, which the trial court granted on July 28, 1994.

On July 20, 1994, National Casualty filed a motion for summary judgment against Cochran, arguing there was no duty to indemnify. On August 9, 1994, the trial court granted the city leave to file a motion for summary judgment against Cochran and George regarding its misappropriation of funds claim. A hearing was set on the city's motion for summary judgment, as well as National Casualty's motion for summary judgment, to be held on September 14, 1994.

On September 13, 1994, Cochran filed a motion for leave to file a brief *instanter* in opposition to the city's motion for summary judgment. Included with the motion for leave was an affidavit executed by Cochran. On September 14, 1994, a hearing was held on both the city's and National Casualty's motion for summary judgment. At the hearing, the trial court denied Cochran's motion for leave to file a brief in opposition to the city's motion. The trial court also refused to consider Cochran's affidavit.

The facts of this case, as gleaned from the Auditor's findings for recovery[1] as well as Cochran's affidavit, are as follows. In 1989, the city of Norwalk operated a recycling program that was funded by an Ohio Recycling Demonstration grant. Because the grant required that a nonprofit corporation run the recycling program, Cochran established the Firelands Resource Recovery Foundation ("Firelands"). Norwalk City Council ("city council") authorized the submission of the grant application, as well as the entry into the grant agreement, in order to

---

1.  R.C. 117.36 provides that the Auditor's factual findings in his or her report are "prima-facie evidence in determining the allegations" of a complaint brought on such report.

obtain the funding. Grant funds were paid directly to the city which remitted the funds to Firelands, pursuant to the grant requirements.

On November 9, 1989, Finance Director George issued a check in the amount of $15,000, from the city's general capital improvements fund, to Firelands for continued operation of the recycling program. The $15,000 was to be an advance against funds from the Ohio Recycling Demonstration grant. Cochran testified, by way of affidavit, that on November 9, 1989, he requested the city council to authorize the $15,000 advance to Firelands and council did appropriate the funds.

In contrast, the Auditor made the following findings of fact concerning the $15,000:

"Check number 025542, dated November 9, 1989, was issued to the Firelands Resource Recovery Foundation for continued operations of the Recycling Program, upon the authorization of the prior Mayor, R. Thomas Cochran. The request was sent to the prior Finance Director, Vernis O. George, who in turn approved the the [sic] request, the purchase order and then issued the check. The $15,000.00 was treated as an advance until grant funds had been received. No note or repayment paper was executed for the repayment of this advance. No formal action of City Council was located for the approval of this advance from the General Capital Improvements Fund."

In 1990, efforts were made to expand the recycling program in Norwalk. Cochran hired a third shift of employees who worked at the recycling center by both collecting garbage and recycling it. The third-shift employees were employed from May 26, 1990 through December 22, 1990, and were subject to the city's classification manual and personnel policy and were also participants in the Public Employees Retirement System.

These employees were paid wages from the city's sanitation department budget for a total amount of $23,237.25. Although there seemed to be an expectation that grant funds would be forthcoming, the city did not receive any funds from the Ohio Recycling Demonstration Grant to cover the wages of the third-shift employees.

Cochran testified, by way of affidavit, that he hired the third-shift employees under the authority of the city charter, which states that "the Mayor shall have the power to appoint, promote, discipline, transfer, reduce or remove any non-elected officer or employee of this City." Section 2.03, Article II, Norwalk City Charter. Cochran further argues that these employees were employees of the City of Norwalk Sanitation Department and were paid out of funds that the city council had appropriated to the sanitation department for salaries.

In contrast, the Auditor made the following findings of fact concerning the third shift employees and the payment of their wages:

"R. Thomas Cochran, prior Mayor, authorized the establishment of a third shift of employees to work at the Firelands Resource Recovery Recycling Center. These employees were hired by the Mayor. The time sheets for these employees were signed by James Cochran, City Safety Service Director and Roger Dixon, Board Member of the Firelands Resource recovery Foundation. The employees hired were treated as City employees, even though they did not work for the City of Norwalk. All the wages paid from the payroll periods ending May 26, 1990 through December 22, 1990, amounted to $23,237.25 and were paid from the City's Sanitation Department budget. On December 31, 1990, an adjustment was made to correct part of the wages paid from the Sanitation Department and the City charged them against the balance left of the City's 1990 Recycling Demonstration grant. This adjustment amounts to $6,496.25, leaving a balance due from the Firelands Resource Recovery Foundation to the City's General Fund of $16,741.00. As of June 28, 1991, no payment has been received from the Firelands Resource Recovery Foundation correcting the wages paid from the City's Sanitation Department to the employees of the Firelands Resource Recovery Recycling Center. Based on the June, 1991 review by the Ohio Department of Natural Resources Internal Audit Division, the $6,496.25 was declared a disallowed reimbursement from the grant funds. Based on this information, the City of Norwalk Sanitation Department is still owed the whole $23,237.25 for wages from the Department's budget for 1990."

On December 22, 1990, the third-shift recycling employees were laid off. Subsequently, several of the recycling employees applied for, and were granted, unemployment compensation. As of June 27, 1991, the city of Norwalk has paid $414.97 in unemployment compensation benefits due to the claims of these employees.

Cochran argues that because the original hiring of the third-shift employees was proper, so is the payment of unemployment compensation. In contrast, the Auditor made the following findings of fact:

"In March, 1991, the payroll department started receiving notice from the Ohio Bureau of Employment Services for unemployment compensation due to those third shift employees, who were paid from the City's Sanitation Department while working for the Firelands Resource Recovery Foundation. As of June 27, 1991, the City of Norwalk has paid $414.97 in unemployment compensation benefits to these supposed City employees. Also, since June 27, 1991, two more of these employees have filed and been grant [sic] unemployment compensation benefits. No payments have been made to these employees since June 27, 1991."

Also in 1991, Cochran contacted Jay's Home Improvement concerning repairs to the Stokely Building, a building used in the recycling program. Finance Director George issued a check in the amount of $16,000, from the sanitation

department budget, to Jay's Home Improvement in anticipation of repair costs. Repair costs, at the time of the audit, amounted to $14,885.38 with an additional, expected cost of $2,000. The city council neither approved the contract with Jay's Home Improvement nor George's payment of $16,000 to Jay's.

Cochran testified that there was a line item in the sanitation department budget for building improvement. Cochran also argues that it is the mayor's responsibility to initiate contracts on behalf of the city. Further, Cochran argues that, under the Norwalk City Charter, it was solely Finance Director George's responsibility to determine whether any payment to Jay's Home Improvement was proper. Cochran relies on Section 7.03, Article VII, Norwalk City Charter, which provides:

"[N]o purchase order of contract shall be valid as an obligation of the City unless it bears a certification, signed by the Director of Finance, indicating that the estimated amount thereof has been entered as an encumbrance in the City accounts against an allotment based on an appropriation and that the money to pay is on hand or is in the process of collection."

However, the Auditor found that both Mayor Cochran and Finance Director George were responsible for improper improvements to the Stokely Building in making the following findings of fact:

"Based on Article VII, Sections 7.01 and 7.06, of the City of Norwalk Charter, states that no city officials or employees shall expend or contract to expend any money, or incur any liability, or enter into any contract which by its terms involves the expenditure of monies on behalf of the City for any purpose in excess of the amounts appropriated for such expenditures and obligations.

"The prior Mayor, R. Thomas Cochran initiated an informal contract with Jay's Home Improvement for improvements to the Stokely Building, located on North West Street in Norwalk, Ohio, without the authorization or approval of City Council. Vernis O. George, prior Finance Director issued a blanket purchase order for $16,000.00 to cover the expenditures for these improvements from the Sanitation Department budget. No monies have been appropriated to cover these expenditures made from the Sanitation Department budget. These improvements have totaled $14,885.38 as of June 28, 1991 and have the potential of being increased by an additional bills which total approximately $2,000.00, that have not been paid as of June 28, 1991."

On March 6, 1990, Cochran presented a resolution to city council requesting the establishment of an international trade zone to encourage foreign businesses to move to or open offices in the Norwalk area. In order to finance the international trade zone, Cochran requested city council to establish two trade zone funds. Cochran informed city council that the funds could be supported by

an award of a $50,000 industrial inducement grant from the Ohio Department of Development and $25,000 Technical Assistance Title IV grant from the United States Economic Development Administration. City council approved the transfer of money from the general fund to the trade zone fund. On November 6, 1990, Cochran again requested that city council transfer from the general fund to the trade zone funds an additional $28,000, which could also be reimbursed by the Title IV grant. Cochran entered into various contracts and made various expenditures on behalf of the city in establishing the trade zone. Finance Director George made numerous payments from the trade zone funds for a total amount of $109,950.01. However, only $25,000 of the grant money expected has ever been realized. Further, both the state and federal governments have stated that the city of Norwalk will not be receiving any further grant funds. Cochran testified, by way of affidavit, that he never told city council that the grant money had already been approved when he requested city council to appropriate monies to the trade zone funds. Cochran further testified that all expenditures satisfied grant requirements.

In contrast, the Auditor found that Mayor Cochran had assured city council that the state and federal grants had already been awarded in making the following findings of fact:

"Based on Article VII, Sections 7.01 and 7.06, of the City of Norwalk Charter, states that no city officials or employees shall expend or contract to expend any money, or incur any liability, or enter into any contract which by its terms involves the expenditure or monies on behalf of the City for any propose in excess of the amounts appropriated for such expenditures and obligations. Also, Article VII, Section 7.03 of the City Charter, states no city official or employee shall have authority to create an obligation against the City by oral agreement. Purchases shall be made by written purchase order, signed by the purchasing agent.

"The prior Mayor, R. Thomas Cochran requested advances of General Fund moneys from City Council on the basis that the City of Norwalk had been awarded grants from both the State and Federal governments to be used to establish two Trade Zone Funds. These Trade Zone Funds established by the Mayor were to be used to establish an International Trade Zone, that included the City of Norwalk and the surrounding communities. By the establishment of the Trade Zone, this would be used to encourage foreign businesses to move or open offices in this area and create jobs for the people of this area.

"The money that was advanced by City Council was to be repaid upon receiving the grant funds from the State and Federal government agencies. Only $25,-000.00 was ever received. Confirmation by both the State and Federal government revealed that the City of Norwalk was not going to be receiving any further grant funds from the State government and that no grants funds had ever been

paid or forthcoming from the Federal government in the last five years. However, the Mayor incurred numerous expenditures over the period of January 1, 1990 through March 31, 1991, that have been charged against these two Trade Zone Funds. As of March 31, 1991, the Mayor and Finance Director, Vernis O. George have expended $109,950.01 from these two Trade Zone Funds. Of the $109,-950.01 expended, only $25,000.00 of the total has been paid for by grant funds. The remaining $89,950.01 expended has been paid for with the use of taxpayers money from the General Fund.

"Of all the numerous expenditures and contracts executed and paid from the two Trade Zone Funds, City Council only approved and authorized three contracts to be entered into during this time. All remaining expenditures and contracts were entered into by the Mayor, without any approval or authorization by City Council. All expenditures and contracts paid from the two Trade Zone Funds were made by the Finance Director, without City Councils' approval or authorization, except for the three contracts that City Council had approved and entered into during this time. No evidence was presented to indicate that the numerous expenditures made had the purchasing agents approval prior to the liability being incurred, nor was there any evidence to indicate that these monies had been encumbered by the purchasing agent.

"Based on the grant agreement contract the Mayor had signed with the State, those expenditures that have been presented as documentation of the use of the State grant funds, do not meet the requirements as proper grant expenditures as stated in the grant agreement contract."

Other expenditures were made by Cochran and George from the city's general capital improvements fund toward the establishment of the international trade zone. Cochran testified, by way of affidavit, that amounts spent were not amounts requiring public bidding under the Norwalk City Charter.

The Auditor made the following findings of fact concerning other expenditures made toward establishing a trade zone:

"On March 6, 1990, the prior Mayor, R. Thomas Cochran requested City Council to approve advancing $50,000.00 to the Free Trade Zone Fund and $25,000.00 to the E.D.A. Trade Zone Fund from the City's General Fund based on the award of a state and a federal grant. Based on the information presented by the prior Mayor, City Council advanced the necessary money to these two funds.

"Upon the advance of the funds, the Mayor incurred various expenditures with and without City Council's authorization and approval. After payment of these expenditures occurred, there was not sufficient moneys available in the two Trade Zone Funds, in which City Council had previously advance money too [sic]. The

Mayor and Finance Director, Vernis O. George authorized and paid additional Trade Zone Fund expenditures form the General Capital Improvements Fund without prior City Council authorization or approval.

"The following is a list of the expenditures that have been paid from the General Capital Improvements Fund that pertained to Trade Zone activity:

"Check number 028862, dated June 12, 1990, to PBM Architects for $812.00, was for services rendered to make a 'model' of the North Coast Aerospace plan. This plan was a drawing of a proposed North Coast Aerospace Park, using the existing County airport. Which the City does not own, as part of the model.

"Check number 030021, dated September 25, 1990, to Salons Internationales de L'Aeronautique et de L'Espace for $3,439.39, for an entry fee to the French Trade Show in Paris, France. Attendance at this trade show was to market and attract perspective foreign businesses to come to Norwalk, Ohio. The North Coast Aerospace plan was to be used as the selling point to attract these foreign businesses.

"Check number 030431, dated October 26, 1990 to Tri–International for $7,986.00, for 'Professional Services: [sic]. The professional services rendered was for consulting fees on the North Coast Aerospace plan, which included the proposed North Coast Aerospace Park.

"The expenditures incurred for the North Coast Aerospace plan and marketing of the plan at the French Trade Show was based on a proposal, which included the use or acquisition of County owned property as a home base, which the prior Mayor had no control over as far as its future uses and availability to the City. As of June 28, 1991, the City of Norwalk does not have a North Coast Aerospace as advertised by the Mayor. The total of these expenditures as [sic] $12,237.39."

In an event apparently unrelated to the international trade zone or recycling center, $9,000 was transferred from the city of Norwalk's account to Texas Guarantee National Bank on February 7, 1991. The $9,000 was a service fee to be used in obtaining refinancing monies for several of the city's delinquent bank loans. However, the refinancing money was not forthcoming and the mayor's office recorded the $9,000 transfer as a loss of revenue. Neither Mayor Cochran nor Finance Director George received any approval or other type of authorization from the Norwalk City Council or the city's finance committee for $9,000 transfer. However, Cochran testified, by way of affidavit, that he never authorized George to transfer the funds and that George acted on his own behalf.

In contrast, the Auditor's Office made the following findings of fact:

"On February 7, 1991, prior Mayor R. Thomas Cochran instructed prior Finance Director Vernis O. George to wire transfer $9,000.00 from the City's Repo Account at Citizens National Bank of Norwalk to Texas Guaranty National

Bank. This transfer was to the credit of Lease Funding Incorporated. Attention: Steve Lambert. This money was a service fee to be used to obtain refinancing moneys for the City of Norwalk Revolving Loan Fund and payoff several delinquent bank loans in which the prior Mayor pledged all account receivables of the City of Norwalk Revolving Loan Fund. the wire transfer was eventually booked as a loss on an investment, when the refinancing moneys did not materialize for the Mayor. The Mayor, nor the Finance Director received any type of approval or authorization from the City Council or the City's Finance Committee for this transaction to take place."

Finally, the Auditor made the following findings of fact concerning the expense incurred in conducting the special audit:

"An extensive amount of audit time was necessary in this special investigation of the City of Norwalk, especially in the areas of determining whether the prior Mayor and Finance Director had obtained the proper authorizations and approvals for numerous transactions of the Trade Zone Funds, Firelands Resource Recovery Foundation and the Revolving Loan Fund."

The amount of audit time necessary to conduct the investigation of the preceding actions by Cochran and George resulted in an expenditure of $10,488.

While refusing to consider Cochran's affidavit testimony, on September 15, 1994, the trial court granted the city's motion for summary judgment against Cochran and George finding them liable for misappropriation of public funds. On October 17, 1994, the trial court granted Cochran's motion for summary judgment against National Casualty, finding it had a duty to indemnify Cochran.

It is from the September 15, 1994 judgment, involving the city's claim for misappropriation of public funds, that Cochran and George appeal, raising the following two assignments of error:

"I. The trial court erred when it refused to accept or to consider defendant, R. Thomas Cochran's, affidavit opposing plaintiff's motion for summary judgment even though said affidavit was timely filed one day prior to hearing as provided for in Civil Rule 56(C).

"II. The trial court erred when it granted plaintiff's motion for summary judgment."

It is from the October 17, 1994 judgment, involving Cochran's claim for indemnification, that National Casualty appeals, raising the following three assignments of error:

"Assignment of Error No. 1

"The court below erred to the prejudice of Appellant in determining that the Auditor of State was not a state regulatory agency within the meaning of Appellant's policy of insurance.

"Assignment of Error No. 2

"The court below erred to the prejudice of Appellant in granting the Motion for Summary Judgment of Appellant Cochran and in denying the Motion for Summary Judgment of Appellant National Casualty Company.

"Assignment of Error No. 3

"The court below erred to the prejudice of Appellant in holding that the Defendants Cochran and George, who based upon the Auditor's findings the court below determined had misappropriated funds, were acting within the scope of their duties; as a matter of law, the conduct of Cochran and George giving rise to the findings of recovery and the judgment of the court below were beyond the insuring agreement of the policy of insurance."

Cochran and George's assignments of error regarding the city's claim for misappropriation of public monies will be addressed first. As the first assignment of error, Cochran argues that the trial court improperly refused to accept his affidavit filed the day before the hearing on the city's motion for summary judgment. Cochran filed his brief in opposition to the motion for summary judgment on September 13, 1994. Cochran also filed his affidavit on the same date. September 13, 1994, was the date set prior to the hearing on the motion for summary judgment. The trial court refused to consider both the brief in opposition and Cochran's affidavit.

Civ.R. 56(C) provides that where a motion for summary judgment is pending before the court, "[t]he adverse party *prior to the day of hearing* [on the motion for summary judgment] may serve and file opposing affidavits." (Emphasis added.) Further, in *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138, syllabus, the Ohio Supreme Court held as follows:

"Civ.R. 56(C) places a mandatory duty on a trial court to thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment. The failure of a trial court to comply with this requirement constitutes reversible error."

Huron County Loc.R. 25.03 also governs motions for summary judgment. Loc.R. 25.03(A) provides that motions for summary judgment "shall be deemed submitted to the Judge at a non-oral hearing on a date fixed in the matter provided by this Rule." Loc.R. 25.03(B) mirrors Civ.R. 56(C) by providing that "[a]ll affidavits, depositions and other evidentiary materials permitted by Civil Rule 56(C) in support of or in opposition to the motion for summary judgment

shall be filed *prior to the day set for the non-oral hearing* on the motion." (Emphasis added.)

■ In the present case, Cochran filed his affidavit the day before the date set for the nonoral hearing on summary judgment. The affidavit was timely under both Civ.R. 56(C) and Loc.R. 25.03(C). While Cochran's brief in opposition may have been untimely filed,[2] the untimeliness of the filing of the brief does not change the rules permitting Cochran to file his affidavit on the day before hearing is set. Therefore, we find the trial court erred in refusing to consider Cochran's affidavit. Accordingly, the first assignment of error is found well taken.

As his second assignment of error, Cochran argues that the trial court erred in granting summary judgment in favor of the city of Norwalk. Cochran specifically argues that, in failing to consider his affidavit, the trial court committed reversible error. In contrast, the city of Norwalk argues that even had the trial court considered Cochran's affidavit the city would still prevail on its motion for summary judgment; therefore, any error was harmless.

In *Murphy, supra,* 65 Ohio St.3d 356, 604 N.E.2d 138, the Ohio Supreme Court considered whether a harmless error test could be applied when a trial court has failed to consider all the evidence before it on a motion for summary judgment. The *Murphy* court specifically held that Civ.R. 56(C) "mandates that the trial court make the initial determination whether to award summary judgment; the trial court's function cannot be replaced by an 'independent' review of an appellate court." *Id.* at 360, 604 N.E.2d at 141. Therefore, the *Murphy* court concluded that a trial court's failure to consider all the evidence before it was always reversible error and automatically required a remand to the trial court.

■ Under the first assignment of error, we held that the trial court failed to consider Cochran's affidavit when ruling on the city's motion for summary judgment. Such failure constitutes reversible error which cannot be cured by demonstrating a lack of prejudice. Accordingly, the second assignment of error is found well taken.

We now turn to the assignments raised by National Casualty regarding the indemnification claim brought against it by Cochran. As the first assignment of error, National Casualty argues that Cochran is not entitled to indemnification regarding the actions between the city and Cochran because such action is specifically excluded under the language of the public official's liability policy

---

2. This court need not address the issue of whether the trial court properly refused to consider Cochran's brief in opposition to the motion for summary judgment as this issue is not raised as an assignment of error.

issued by National Casualty. The public official's liability policy provides indemnification coverage as follows:

"The Company will pay on behalf of the INSURED all sums which the INSURED shall become legally obligated to pay as damages as a result of claims first made during the period of this policy, against the INSURED by reason of WRONGFUL ACT(S) rendered in the discharge of the PUBLIC ENTITY duties."

The policy defines "insured" as "lawfully elected, appointed or employed officials of the PUBLIC ENTITY." Further, the policy defines the term "wrongful act(s)" as "any actual or alleged violation of any federal, state or local civil rights, or breach of duty by the INSURED in the discharge of duties for the PUBLIC ENTITY, individually or collectively."

The exclusionary clause upon which National Casualty relies provides as follows:

"The Company shall not be obligated to make any payment nor to defend any law suit in connection with any claim made against the INSURED * * * for any loss, cost, civil fine, penalty or expense against any insured arising from *any complaint or enforcement action from any federal, state or local governmental regulatory agency.*" (Emphasis added.)

National Casualty argues that this exclusionary clause is unambiguous and clearly excludes indemnification in the present case because the Auditor of Ohio is a governmental regulatory agency.

It is well-settled law that the court may not turn to rules of construction where the language of an insurance policy is clear and unambiguous. *Tomlinson v. Skolnik* (1989), 44 Ohio St.3d 11, 12, 540 N.E.2d 716, 717–718. However, where the policy language is not clear and unambiguous, the trial court is obligated to look to the rules of construction. Where such ambiguity exists, the language in an insurance policy is to be construed against the insurer and in favor of the insured. *Buckeye Union Ins. Co. v. Price* (1974), 39 Ohio St.2d 95, 68 O.O.2d 56, 313 N.E.2d 844, syllabus.

In the present case, the complaint for illegally expending and/or misappropriating funds was brought by the city of Norwalk against Cochran after the city had received the Auditor's report. Therefore, the city argues, that because the Auditor's Office is clearly a governmental regulatory agency, liability is excluded by the language of the insurance policy.

The policy itself does not define the term "governmental regulatory agency." Further, we reject National Casualty's argument that a governmental regulatory agency is any governmental body that issues regulations. Arguably,

every governmental body issues rules or regulations of some sort. If such an interpretation were adopted, the exclusionary clause would effectively eliminate National Casualty's duty to indemnify any time a governmental body, of any type, took action against a public official. Such a meaning would essentially eliminate all coverage for a public official's wrongdoing and was obviously not intended by the parties. Therefore, we find that the term "state regulatory agency" is so broad and elusive as to be virtually meaningless and thus ambiguous. Accordingly, we now turn to the rules of construction regarding ambiguous language in an insurance policy.

■ Specifically, we note the rule of construction requiring any ambiguities to be construed in favor of the insured. *Buckeye Union*, 39 Ohio St.2d 95, 68 O.O.2d 56, 313 N.E.2d 844, syllabus. Such rule mandates a finding in favor of Cochran as the insured. Therefore, the trial court properly held that Cochran is entitled to be indemnified if the city of Norwalk prevails in any of the present claims against Cochran. Accordingly, the city of Norwalk's first assignment of error is found not well taken.

The second and third assignments of error will be addressed together. Essentially, the city of Norwalk argues that if Cochran is found to have illegally expended or misappropriated funds, such actions were not rendered in the discharge of his duty as mayor. Therefore, National Casualty argues, Cochran's actions are not covered under the terms of the policy.

■ We hold that National Casualty's argument is defeated by the very language of the policy itself. The stated purpose of the public official's liability policy is to indemnify public officials who "by reason of *wrongful acts* rendered in the discharge of the public entity duties" become liable for such acts. (Emphasis added.) Because the language of the insurance policy specifically covers wrongful acts, National Casualty's argument must fail. Accordingly, the second and third assignments of error are found not well taken.

Upon due consideration, the judgment of the Huron County Court of Common Pleas regarding the claims of the city of Norwalk against R. Thomas Cochran and Vernis O. George is reversed. The judgment of the Huron County Court of Common Pleas as to the claim of Cochran and George against National Casualty Company is affirmed. This cause is remanded to the trial court for further proceedings consistent with this decision. Costs of this appeal, as provided for under App.R. 24, are assessed equally between the city of Norwalk and National Casualty.

*Judgment accordingly.*

Sherck and Grey, JJ., concur.

Lawrence Grey, J., retired, of the Fourth Appellate District, sitting by assignment.